483 A.2d 1281

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Stephen Henry MILLER.

Misc. Docket (Subtitle BV) No. 20, Sept. Term, 1983.

Court of Appeals of Maryland.

Nov. 28, 1984.

594

Melvin Hirshman, Annapolis, Bar Counsel to the Atty. Grievance Com'n of Maryland, for petitioner.

Joseph P. Manck, Annapolis, for respondent.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and W. ALBERT

MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

COUCH, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Stephen H. Miller, alleging numerous violations of the Code of Professional Responsibility. Pursuant to Maryland Rule BV 9(b), we referred the matter to Judge Raymond G. Thieme, Jr., Circuit Court for Anne Arundel County. After conducting an evidentiary hearing, Judge Thieme concluded that Miller violated certain provisions of DR 9–102, DR 1–102, and DR 2–110.[1] We agree and order, in light of the extenuating circumstances of this case, that Stephen H. Miller be indefinitely suspended from the practice of law.

I

Stephen Miller began the practice of law in 1975. He quickly developed a burgeoning practice in zoning, building and realty law.

Miller's success was short-lived, as worsening economic conditions and a deteriorating marriage forced him to close his office. Excessive drinking, combined with the strong medication Miller was already taking, exacerbated his problems.

In spite of Miller's inability to properly attend to his practice, he agreed to represent a client named Fred Pritt in a business transaction in December of 1981. What followed, and ultimately gave rise to Miller's transgressions, was stated by Judge Thieme in his findings of fact:[2]

"In the beginning of December, 1981, Fred Pritt gave Miller a check in excess of $73,642 which was payable to

---

**1.** The pertinent portions of these disciplinary rules are set forth in section I of this opinion.

**2.** All references to the supporting authority for the court's findings of fact have been omitted.

Equitable Trust Company. Pritt testified that at that time he gave Miller oral instructions to make certain loan payments and secure the release of certain pieces of property which were subject to various mortgages. Pritt instructed Miller to take the check to Baltimore and secure these releases from Equitable. Apparently, Equitable's loan was about to become due and if it was to be extended, would be renegotiated at a higher interest rate.

Fred Pritt was obviously anxious to secure the release from under the mortgage of as much of his property as he financially could before these negotiations commenced. There is a conflict as to whether Miller or his secretary actually received this $73,642 check. Nevertheless, the evidence is clear that on December 3, 1981, a deposit of $73,642 was made to Miller's escrow account at Equitable Trust. On the reverse side of the check was stamped "Stephen H. Miller, Attorney-at-Law". Pritt testified that he never authorized Miller to stamp the back of the check and deposit it in his account. During December, Miller represented both to Equitable Trust Company and Pritt that he dropped off both the check and the releases with Equitable. Pritt relied on this information when dealing with Equitable. Not receiving its loan payments when due, Equitable advised Fred Pritt it intended to foreclose on his property as of December 15, 1981. Pritt's loan was now in default. On Christmas Eve, while at a party, Fred Pritt questioned Miller about the releases. Miller advised Pritt that he would promptly look into the matter when he returned to his office next week.

The statements Miller made on Christmas Eve are accepted by the Court regardless of what Miller previously stated concerning his continuing alcohol and drug abuse.

From November, 1981 through January, 1982, numerous checks which were made payable to Miller were drawn on his escrow account. These withdrawals were not authorized by Pritt as fees for Miller. Also, there was a check for $1,998.50 which was made payable to the

Clerk of the Court for Anne Arundel County. Some of the checks drawn on Miller's escrow account at Equitable were signed by Miller and others by his secretary. Miller testified that he neither authorized his secretary to write these checks nor authorized her to sign his name to them. However, Collison, an investigator for the State's Attorney's Office, testified that Miller told him that he knew that his secretary was writing checks on the escrow account and signing his name to them.

During this period, Miller maintained a joint account with his secretary, Ms. Jackson, at State National Bank. This account was used to pay office bills and Miller's personal expenses. On December 1, 1981, the joint account was overdrawn by approximately $920.00. After December 3, 1981, most of the checks drawn on the escrow account and made payable to Miller were deposited into the joint account. From December, 1981 through February, 1982, both Miller and his secretary drew checks on this joint account both for Miller's personal use and to pay office expenses.[1]

Miller testified that the first time he knew that Pritt's funds were in his escrow account was in January, 1982. He also learned of the foreclosure at that time. The more credible evidence clearly shows that Miller permitted his secretary to write the checks drawn on the escrow account and knew that the funds were being deposited into the joint accounts. Miller's testimony that the money in the escrow account was for past fees due from Pritt has absolutely no factual basis.

On January 12, 1982, Miller cashed a $50,500 check drawn on his escrow account at Equitable Trust. He then deposited $50,000 into an old operating account (#700–405–2) at State National Bank. Miller spent the remaining $500 of the escrow funds to see his father in the Virgin Islands to apprise him of the situation. Miller testified that he was aware that he was using escrow funds for the trip. Throughout the month of January, 1982, funds were being transferred from Miller's operat-

ing account at State National to the joint account. Miller admitted to authorizing his secretary to pay a private security guard from funds in the joint account.

From the evidence presented, the Court finds that Miller knew that Pritt's funds were being transferred from the operating account to the joint account to pay bills. Miller either paid or authorized payment for his office and personal bills that were drawn on the joint account.

On February 3, 1982, Pritt retained Jerome May as his counsel. That afternoon May spoke with Miller and demanded the return of Pritt's money. Miller told him that Pritt owed him money for legal services. Unsatisfied with Miller's answer, May filed a Bill of Complaint and sought an Order to freeze Miller's bank accounts. This was immediately signed by Judge Wray. The next morning, Miller and May met with Judge Wray. At this meeting, Miller represented that there was no intermingling of funds and that all of the funds were on deposit at First National Bank. Miller said that there was no problem in returning the money to Pritt at once. Relying on these representations, May agreed to follow Miller to a previously scheduled hearing, then they would proceed to the bank.

After the hearing, Miller first stopped at his office. He talked to his secretary about a transfer of funds. Counsel then went to State National Bank. At State National, May found that Miller only had about $32,000 in the operating account. After making many telephone calls at the bank, Miller informed May that $48,000 was being wired from his father in Ocean City. May received a certified check for $32,000 representing the balance in Miller's account at State National. The balance of the funds were received by May the next day, February 5, 1982.

---

[1] The checks included those to pay bills for American Express, rent payments for Miller's Crownsville home, telephone bills, payments toward Miller's personal loan at C.I.T. Finance Company, Safeway, Nieman Marcus, and Dennis Detective Agency."

After hearing testimony of two physicians on Miller's physical condition, the court concluded:

"at the time of the misconduct (December 1981—February 1982), Miller's mixed substance abuse (alcohol and Percodan), personal and marital problems impaired his ability to handle his limited law practice. However, Miller knowingly misappropriated his client's funds. Further, he consciously made misrepresentations to Judge Wray.

At the present time, Miller has his psychiatric and emotional difficulties under control. He is presently working fulltime as an assistant to an attorney, Anne McKenzie, in Baltimore, Maryland. She has a general practice which does not include real estate work. Miller's work involves the preparation of legal cases and he goes to Court with Ms. McKenzie. McKenzie is willing to act as his mentor and allow him to practice in her office under her direct supervision."

The court then discussed the findings with respect to the violations of the disciplinary rules.

*"Disciplinary Rule 9–102*

'Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or a law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

2. Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the

disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

3. Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

4. Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.'

The Court finds that Respondent failed to preserve the property of his client, Fred Pritt, by intentionally drawing checks on the escrow account for Respondent's personal and office use; by withdrawing the remaining $50,500 of Pritt's funds from the escrow account and not placing it into an escrow account at another bank; and by subsequently transferring Pritt's funds from his operating account at State National into his joint account at the same bank.

Respondent failed to maintain complete records of Pritt's funds. In addition, when Miller was asked by Pritt and representatives from Equitable Trust about the funds (because Equitable had not received the money to secure the releases of the lots) he did not reveal the true location of the money to them. Lastly, Respondent violated D.R. 9–102(B)4 by not promptly delivering the money to his client when demanded on February 3 and 4, 1982.

*Disciplinary Rule 1–102*

'Misconduct.

(A) A lawyer shall not:

2. Circumvent a Disciplinary Rule through actions of another.

3. Engage in illegal conduct involving moral turpitude.

4. Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

5. Engage in conduct that is prejudicial to the administration of justice.'

Respondent, by authorizing his secretary to draw checks on his escrow account for his personal and office use, had the effect of circumventing D.R. 9–102(A)2 and D.R. 1–102(A)3. Miller's conduct clearly shows that he knew the escrow account was almost solely made up by the deposit of the $73,000 check and his joint account was overdrawn. Miller's intentional use of his client's funds for personal and office expenses was illegal conduct involving moral turpitude.

Respondent misrepresented both to Equitable Trust and Pritt that he had completed the transaction. He further misrepresented to Judge Wray and May that Pritt's funds were not commingled and were all located in one bank. Miller's misrepresentations to Judge Wray and his delay in returning Pritt's money amounted to conduct that was prejudicial to the administration of justice.

*Disciplinary Rule 2–110*
'Withdrawal from Employment.
 (B) Mandatory withdrawal.
 A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:
 2. He knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule.
 3. His mental or physical condition renders it unreasonably difficult for him to carry out the employment effectively.'

By Respondent's own statements, he realized that his drug and alcohol problem, as well as his marital problems, impaired his ability to undertake the strain of private practice and render competent legal services. The Court commends Miller for recognizing his impair-

ment and voluntarily winding down his law practice. Unfortunately, Respondent should not have undertaken this task for Fred Pritt.

Having found the above violations, it follows that Stephen Miller violated the blanket provisions of:

*Disciplinary Rules 1–102*

'Misconduct.

 (A) A lawyer shall not:

 1. Violate a Disciplinary Rule.

 6. Engage in any other conduct that adversely reflects on his fitness to practice law.'"

Judge Thieme found as mitigating factors occurring during the entire period of misconduct Miller's excessive daily drinking coupled with the use of Percodan, emotional strain caused by marital strife and personal identity problems.

We accept and adopt these findings since they are supported by clear and convincing evidence.

## II

■ Miller filed detailed exceptions to Judge Thieme's findings, which we now address. It must be remembered, however, that the lower court's factual findings are prima facie correct and will not be disturbed on review unless clearly erroneous. *Attorney Griev. Comm'n. v. Collins*, 295 Md. 532, 548, 457 A.2d 1134, 1142 (1983), citing *Attorney Griev. Comm'n. v. Kahn*, 290 Md. 654, 678, 431 A.2d 1336, 1349 (1981).

### Exception 1

■ Miller excepts to the finding that Pritt gave Miller a check in excess of $73,640 along with oral instructions for Pritt's loan payments. This check supplied the money which was to be later misappropriated. Respondent points to several inconsistencies in Pritt's testimony as proving that the witness was unworthy of belief.

Judge Thieme, having observed the demeanor of the witness, was certainly entitled to believe Pritt's testimony

concerning the check and instructions given to Miller. Coincidentally, Miller made a deposit of $73,642 to an escrow account shortly after the check was allegedly given to respondent. We find this exception to be without merit.

### Exception 2

Miller next objects to the court's finding that by September of 1981, Miller was totally ignoring his legal practice. Respondent claims that by this date he had closed his practice down and was not doing any further work for any remaining clients. Miller also disputes that he improperly filed thirty three deeds.

Whether these conclusions were warranted or not, the court explicitly stated in its written findings that the improperly filed deeds did not enter into the subsequent findings of ethical violations. We therefore find this exception to be without merit.

### Exception 3

■ Respondent here charges that the court's written findings of fact were based substantially, if not solely, on inquiry panel testimony. Miller alleges that the judge neglected the testimony of the physicians produced at trial in determining his findings.

■ Contrary to Miller's assertions, Judge Thieme reports in his findings the testimony of two physicians. It is settled, moreover, that a judge may pick and choose the evidence on which to base his findings. *Attorney Griev. Comm'n. v. Nothstein,* 300 Md. 667, 684, 480 A.2d 807, 816 (1984). We find this exception to be without merit.

### Exception 4

Miller excepts to the finding that he advised Pritt that the releases would be looked into the week after Christmas. Miller claims that he in fact told his secretary to handle the matter.

Testimony was heard at various stages of the hearing that Miller himself would take the $73,642 check for the releases, that his secretary would perform the task, or that one or the other would satisfy this obligation. Ultimately, the secretary secured several releases.

We conclude that Judge Thieme could have found that Miller stated he would personally take the check for the releases. In any event, this specific finding is insignificant and irrelevant to the ultimate finding of misappropriation and violation of other disciplinary rules. It follows that the exception is without merit.

### Exceptions 5 and 6

■ Miller criticizes the court's finding that both he and his secretary signed the checks drawn on the escrow account. Respondent contends that he signed only one check and that the remaining checks were signed by his secretary without authorization. Miller also disputes the finding that he knew the money in the escrow account was being placed in a joint account with his secretary.

The many checks introduced into evidence bear at the very least a close facsimile of Stephen Miller's signature. Noble Collison, an investigator, testified that Miller admitted that the checks drawn on the escrow account were authorized. Drs. Spodak and Whitfield pronounced that Miller at a minimum knew partly what was occurring in his office. Judge Thieme heard Miller's explanations of the disbursed checks.

From this evidence, we cannot conclude that the court's findings concerning the checks were clearly erroneous.

### Exception 7

■ Miller claims that $50,500 of Pritt's original funds was eventually placed into an additional escrow account, and not an operating account as found by Judge Thieme. Respondent concedes, however, that the evidence introduced at trial indicated that the money was placed into an

operating account. Miller himself calls this alleged second escrow account an operating account in Exception 9.

This exception is without merit. Pritt's money, whether first transferred to a second escrow account or to an operating account at State National Bank, was ultimately transferred to a joint account to pay Miller's personal expenses.

### Exception 8

 Miller states that contrary to the court's finding, he did not authorize his secretary to pay for a private security guard with Pritt's funds.

The court found that Miller and his secretary drew numerous checks on his joint account, one of which was to pay Dennis Detective Agency. We cannot say that the finding of authorization for one check was clearly erroneous, and find this exception to be without merit.

### Exception 9

 This exception disputes the court's finding that Miller knew Pritt's funds were being transferred to the joint account.

Evidence was available for the judge to conclude that Miller knew of the money transfer. Drs. Spodak and Whitfield testified that Miller was aware of the activities in his office throughout the period the money was being transferred. Judge Thieme found that not only was Miller aware of the funds transfer, respondent either authorized or himself issued the transferring checks. We cannot say these findings are clearly erroneous.

### Exception 10

 Miller claims that the judge erred in concluding that respondent knowingly misappropriated funds. Specifically, he alleges that the testimony of Dr. Spodak, a psychiatrist upon whom the court partly relied for this finding, was unclear in this regard.

Miller conceded at oral argument, however, that there was other ample evidence of his wilful misappropriation. Respondent also admitted that the judge was not bound to accept the testimony of either of the doctors on this particular subject. Accordingly, we reject this exception.

### Exception 11

 Miller excepts to the lower court's finding that he failed to preserve the property of his client in violation of D.R. 9–102. In his very next statement, however, respondent admits he cannot claim that he preserved Pritt's property. Rather, Miller suggests that if he did fail to preserve the property, such failure was not intentional.

There can be no question that the money Pritt entrusted to Miller was placed into a joint account and disbursed to pay Miller's expenses. Respondent did not maintain proper records of Pritt's money, and could not deliver the funds to Pritt when ordered by Judge Wray. There was ample evidence from which the court could infer Miller's violation of several provisions of D.R. 9–102. These findings are not clearly erroneous, and Miller's exception is without merit.

### Exception 12

Miller argues that the court was incorrect in its finding of a violation of D.R. 1–102. He argues, again, there was no showing of intentional misconduct.

We reject this exception for the reasons stated in Exception 10.

### Exception 13

 Respondent here raises an exception to Judge Thieme's failure to include a discussion of witness Biglane's testimony.

The fact that this testimony was not specifically discussed in the court's finding does not indicate a failure to consider it. *Attorney Griev. Comm'n. v. Kerpelman*, 288 Md. 341, 361, 420 A.2d 940, 950, *cert. denied*, 450 U.S. 970,

101 S.Ct. 1492, 67 L.Ed.2d 621 (1980). Moreover, the court was free to disregard this evidence if it was not credible. The reception of evidence is to a large degree entrusted to the discretion of the trial judge and will seldom be reversed. *Id.* at 359, 420 A.2d at 949.

We do not believe that the court committed error.

### Exception 14

Miller states that he never testified that .$500 of the $50,500 taken from the operating account was spent to travel to see his father.

■ Mr. Miller did "guess" during testimony that he spent the $500 on the trip to his father. The court could have concluded, based on this and other testimony, that this "guess" represented the truth.

The finding is not clearly erroneous.

### Exception 15

Miller points out that he returned all money due Pritt within twenty-four hours. This is not an exception to a finding of the lower court, but is a correct observation.

### Exception 16

Miller complains in this exception about the lack of discussion by the court in its findings of the testimony of the two physicians.

For the reasons stated in Exception 3, this exception is without merit.

### Exception 17

Miller concludes his exceptions by saying he could not have had the ability to knowingly misappropriate Pritt's funds.

For the reasons stated in Exceptions 10 and 12, we find this to be without merit.

## III

We come now to the imposition of sanction on Stephen Miller. Bar Counsel recommends disbarment; respondent requests leniency by urging suspension with a right to immediately reapply for reinstatement.

Judge Thieme found, and we agree, that Miller violated several disciplinary rules, and was wilfully dishonest. Ethical violations involving wilful dishonesty will often mandate disbarment unless the most compelling extenuating circumstances are shown. *Attorney Griev. Comm'n. v. Moore,* 301 Md. 169, 482 A.2d 497 (1984); *Nothstein, supra,* 300 Md. at 687–88, 480 A.2d at 817–18.

We have recently recognized that problems attributed to alcohol addiction may present circumstances sufficient to warrant sanction less severe than disbarment.[3] In cases where the addiction was proven, we have ordered indefinite suspension when the addiction was to a substantial extent responsible for the conduct of the attorney. *See, e.g., Attorney Griev. Comm'n. v. Aler,* 301 Md. 389, 483 A.2d 56 (1984) (knowing misconduct and misappropriation of a client's funds by an attorney suffering from alcoholism resulted in indefinite suspension); *Attorney Griev. Comm'n. v. Nichols,* 301 Md. 172, 482 A.2d 499 (1984) (attorney who neglected clients' cases due to alcoholism ordered indefinitely suspended with right to immediately reapply); *Attorney Griev. Comm'n. v. Truette,* 299 Md. 435, 474 A.2d 211 (1984) (indefinite suspension with limited reinstatement ordered for alcoholic attorney who failed to act competently and zealously); *Attorney Griev. Comm'n. v. Dunphy,* 297 Md. 377, 467 A.2d 177 (1983) (attorney convicted of misappropriation of client's funds indefinitely suspended where acts giving rise to disciplinary charges resulted from physical and mental maladies including alcoholism); *Attorney Griev. Comm'n. v. Willemain,* 297 Md.

---

**3.** For a comprehensive analysis of how courts from across the country have treated cases of this nature, see Annot., 26 A.L.R. 4th 995, 1029, § 9 (1983).

386, 466 A.2d 1271 (1983) (attorney's incompetence caused by alcoholism; court ordered indefinite suspension with right to immediately reapply if enumerated conditions met); *Attorney Griev. Comm'n. v. Finlayson*, 293 Md. 156, 442 A.2d 565 (1982) (attorney's neglect of client matters because of alcoholism resulted in indefinite suspension with right to immediately reapply).

Judge Thieme found that at the time of the misconduct, Miller's mixed substance abuse, personal and marital problems impaired his ability to handle his limited law practice. The court urged us to consider these several mitigating factors when reviewing respondent's actions. These facts, while not excusing the dishonest and improper acts, were causally connected and sufficiently exculpatory to warrant indefinite suspension.

By this sanction we do not in any way lessen our resolve to deal severely with those found to have wilfully misappropriated a client's money. We merely hold that in this case, our primary goal of protecting the public will be satisfied by indefinitely suspending Stephen Miller from the practice of law.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS, INCLUDING ALL COSTS OF TRANSCRIPTS, PURSUANT TO RULE BV15c, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST STEPHEN HENRY MILLER.